Thank you very much. Good morning, and may it please the court, my name is Michael McBride, and I have the privilege of representing the petitioner of G3 Enterprises, Inc. G3 is the rail logistics company for the ENJ Gallup liner, headquartered in Modesto, California. Gallup is the largest family-owned winery in the world, producing over 80 billion cases of California wine and spirits each year. G3 uses rail transportation extensively to keep consumer prices low. Before the Indo-Pacific-Southern Pacific merger, G3's facility had access to three railroads, UP, SP, and BNSF, who is here today supporting G3. G3's facility in Modesto is now captive to UP because of two unilateral actions of UP. One, by eliminating SP in the merger, and two, by depriving BNSF of access to G3's facility, thereby creating a monopoly for itself. These anti-competitive circumstances will only get worse over time. Who do you consider to cause the SPB to provide relief to G3? I was going to ask you, at the time of the merger, Procter & Gamble owned the facility, is that correct? That is correct. My understanding is, if the merged facilities, the merged transportation companies and railroads, take position that their representation to provide continued service only extended to the owner, at that time, which would have been Procter & Gamble, do you take issue with that? I absolutely do, yes. They make very many representations. And now that's their argument, as you just stated it. But they represented, for example, that not a single shipper, this is the end of the civic concern, specific to the government, through their CEO, UP, we will not allow a single shipper of this choice between two railroads. The UP-SP merger will intensify competition for all shippers. I could go on and on for many, over three pages in the appendix to the NSF spree. And among them is a representation that competition would be intensified in Modesto for customers there. And that they would not diminish the Modesto switching dispute. These are representations, by the way, that are not intended for lawyers or judges. These are representations that were intended for non-lawyer business people. But I submit to you that even as judges or lawyers, it is impossible to read these representations in any way as ambiguous or as allowing the circumstances that led to this outcome. UP was obliged by the STP when it approved the merger to adhere to all of its representations. It blatantly did not do that. And the board utterly failed to recognize that these representations were clear as a bell and were understood by the business people who were aware of them to mean that the facility would not lose competition under the law, which the agency, by the way, doesn't even cite or discuss in the two decisions under review. The law, and there is really no dispute about this, because we voted, we are not going to vote on the merger. But at page 15 of the MSS brief, this will help you, I think, understand clearly cutting through all the lawyerese. The policy is this. This is the agency's words. Since 1980, at least, we have consistently imposed merger conditions to preserve two railroad services where it existed. And we have imposed remedies to preserve competition where the number of carriers serving a shipper has gone from three to two in limited circumstances on a case-by-case basis. Instead, in the decisions under review, what the agency did was look only at the settlement agreement that BNSF was able to extract from Union Pacific, which was limited to two-to-one shippers, and simply didn't meet the technical definition of that prior to the merger, so you lose under the law. And we are on the old statute that was in effect at the time of the NSD file its application, the text to our brief, 49 U.S.C., section 11344B1E. The statute says the board was required to consider whether there would be an adverse impact on competition among rail carriers in the affected region, which in this circumstance we're talking about Modesto. It is in your position that the board did not consider the need. It doesn't require the board to come to a particular conclusion one way or the other. Understood. The board, you will search in vain in the two decisions under Review 106 and 107 for even a reference to it, let alone a discussion of it in our board analysis of it. The board simply didn't even, it seems to me, understand that it had an obligation to confront its own policy on the statute. This is perhaps understandable because two of these three board members are not lawyers. They're wonderful people, but they didn't, I think, understand what their legal obligation was here. And we cited the policy back to them on reconsideration of meeting G3 in Vienna 7, and they again failed to discuss it. So they didn't confront the law. They didn't confront their own policy. They didn't grapple with it. They didn't recognize that the MP had created a monopoly for itself here. They simply looked at the settlement agreement and said, well, you didn't meet two-to-one definition at the time, therefore you lose. But that's not the law. In the agency's decision 44, under which they approved the MPSB merger in the first place, the agency said we will consider whether three-to-two shippers, people who had three railroads before the merger gone into, might be entitled to relief. And we cited in our brief and defined these on pages, excerpts of the record, 372-74, 379 and 80. I'm sorry, excerpts of the record, but I'm not citing the pages from the MPSB decision. But it's the Guantanamo references, it's the City Public Service Board of San Antonio references, and it's the Lake Charles shipper reference. And these are excerpts of the record, 180 and 182, and 172-174. And the board actually did provide relief to up to one three-to-two shipper in Lake Charles, and most recently I gave you the decisions in co-refinery by 28 J. Larry. The board recognized that three-to-two shippers might be entitled to relief, and the board said it would remain open to consider such shippers. We cited Decision 21 of the board in the planning that was filed in the very first sentence, and it was filed alone. And Decision 21 of the board relies on 49 U.S.C. 11-327. One single spot. Here's what it says. When cause exists, the board may make appropriate orders supplemental to an order made in a proceeding under sections 11-322 through 11-326 of this bill. Those sections are the merger and acquisition sections. So in other words, the water tech board has capital authority to issue a supplemental order and say, well, this facility may have had three railroads at the time of the merger going into it. So it would technically qualify under the VNSF settlement agreement at the time, but now that Indian Pacific is unilaterally reduced into one, it should be entitled to the South Pacific Railroad spending. Because had the merger never been approved, the facility would still have been Indian Pacific and Southern Pacific. I'm not sure quite what to believe, but as I understand the record, Gallo and Plum acquired this facility, or G3 acquired this facility, and this proceeding really wasn't brought up for quite some time after that, maybe like 10 years. Why decide to delay? Great question. The Gallo winery is located on the MAT. If you look at our map in the brief, it has access to both UP and VNSF via the MAT. The Gallo winery is simply out of space of the facility. So G3 acquired the facility we're talking about here, which is off the MAT, with assurances that there would be access to VNSF. What assurances from who? From Procter & Gamble, from the MAT, and from VNSF. All of this due diligence. I guess a red herring, by the way, Your Honor, under the statute, the regulatory statute doesn't take that into account. What I'm trying to answer is the question, but not assurances from UP. Correct, because they were barely doing business with you, because what happened in the U.S. what happened from 2004 to 2007? They spent $49 million, according to the record, Mr. Lubeck's affidavit, to upgrade this facility to make it suitable for what they do. I'm told, by the way, it's not in the record, they must have spent over $50 million to upgrade the facility. It's remarkable. It's huge. But it is difficult. So they spent the additional money, even though, in their analogy, they have the responsibility to this point? Because there is no possible way for Dallo to grow without this facility. So that is why they are here. They need this outcome. They need this case to go back to the Surface Transportation Board so that the board can confront the problem that UP has created, a monopoly, and the board simply failed to recognize it and recognize that it's all wrong. And it's obligated, meaning that the obligation imposed on UP to adhere to its representations were both violated by UP. But I'm still not sure I understand why it took 10 years for Dallo or for Su-3 to object. Well, because they weren't using the BNSF until then, because they were making all these upgrades. They weren't shipping the BNSF out of that facility. They were shipping. I don't believe they were shipping much. They may have been shipping a little, but they were mostly upgrading the facility. Just for me, it took 10 years to do that. This is a long-term project for the future growth, and that's why they bought the facility. I understand that, but maybe you may not know fully the answer, but I know I'm not quite getting it. No, I know what the record shows, and I believe this would be also the truth, which is they first asked BNSF for access in 2011, and then BNSF notified UP in 2012. That's what the record showed, and that's when UP said to BNSF, no, you may not have access to the G-3 facility, and then they promptly went to the Service Transportation Board, and that was five years ago, complaining about it. But the expansion, this was all for the expansion of the future growth. Okay, that's what this was about. And you did need the rail transportation from BNSF until 2011. Those are the facts. Whether you think it's an incredibly long time that it got to that point or not, they didn't need it until it got to that point. But apparently they were shifting between, they were shifting during those two-year periods with UP. Well, they were shifting both UP and BNSF out of the winery, which is on MESI, and out of the G, if any shipments out of the G-3 facility up to that time would have been on UP. So they weren't doing much business with UP until 2011. The way I got this is that the representations were made to Procter & Gamble and then to G-3, and, therefore, we didn't make any of those representations. 11, because they are the shipper. When you say the shipper, was the shipper back in 96? And until 2011, because I think in 2011, didn't G-3 ask BS, Burlington, Arlington, Santa Fe, to service the warehouse facility? And when you're applying 11, well, first of all, the representations, one of them was made to the president of the Modesto and Empire Traction Company. That's in ER-97. He writes to UP, and UP writes back in ER-99. So this is a representation to him, and he wrote on behalf of his customers, the local customers. Now, Gallo was a customer of MET. Procter & Gamble was listed in the UP tariff. But the representation, this particular one, was made directly to the president of the MET Railroad on behalf of his customers. That's who he said he wrote on behalf of. And they said they wouldn't diminish the Modesto switching district, which can only mean they won't cut people off from switching, and that's what they've been doing. All of the other representations, Your Honor, in the appendix to the NSS brief, they're listed comprehensively, were made to the world. They weren't made to Procter & Gamble. They weren't made to a particular shipment. These were sworn statements, or in the pleadings of the lawyers for Union Pacific and Southern Pacific, to the government. In the application emerge verified statements that were included with the application. The ones that I've read, other than the MET letter exchange, are either in the pleadings to the agency, STD, or in the sworn statements of their witnesses, including their CEO. You're down to about a minute, Your Honor. Let's see it. I do need to take a break, sir. Oh, you should have alerted me that we were going to split arguments. Maybe I should have been aware of that. So we're down to, how much time do you expect to have? About four minutes, Your Honor. We can put four minutes on the clock, then, please. Thank you. May it please the Court, my name is Roy A. Clark, and I represent Intervenor BNSF Railroad Company. I think I overstated, so in any event, you can continue to hear your four minutes. Thank you, Your Honor. For two independent reasons, the STB should not allow the creation of the railroad mobility at the G3 facility. First, it is exactly what Union Pacific committed and represented would not happen as a result of the merger, and the STB said it is the decision approving the merger that the Union Pacific would be allowed to hold its representations. Second, the STB has ran a relief in indistinguishable situations and has given no sound pieces for departing from Preston. How some of these arguments to the Board, and the Board did not agree with these arguments. Why do you think the Board didn't accept these arguments? Well, with respect to the commitments piece, the Board added words that were not in some of the commitments and said that the context justified adding those words. In particular, the statement of Richard Davidson, who was the Chairman and Chief Operating Officer and President of various Union Pacific entities, was that the Union Pacific would not allow a single shipper to lose a choice between two railroads. The Board said what he meant was it wouldn't allow a single shipper that had a choice between two and only two railroads, UPNSP, before the merger to lose a choice between two railroads. That's not what he said. My standard of review is a piece of discretion. So if the Board used the context of all the proceedings that the Board here presided over to make that determination, why is that in a piece of discretion? The Board didn't use the context of all the proceedings, Your Honor. The Board used the context of Mr. Davidson's own statement, which is only three pages long. It serves a record 49 to 51. The Court carried it for itself and conceded that what the Board calls the context is simply taking words from a different sentence and inserting them into the sentence we rely on. That is not a proper use of the context. But you didn't understand whether the Board relied on all of the information that it garnered during the previous merger proceedings. Do you think the Board just disregarded all of that information? Well, I think part of the Board's error here, and the other part of the case, not the Representation's part, but the three-to-one part of the case, is that the Court did disregard important prior decisions it had made between effective two-railroad competition and lack of effective two-railroad competition in the situations in which three railroads serve the facility pre-merger. And the Court did fail to take account of its own decisions, saying that what we look at in the three-to-two situation is whether there was an effective two-railroad competition. Obviously, there's not effective two-railroad competition in the G3 facility today because there's no railroad competition at all. And yes, the Board failed to take account of the relevant regulatory context. That's part of our claim of error in this case. Does it matter in your view that the facility, G3, was owned by a prior entity at the time the merger proceedings were completed? It certainly doesn't matter to regulatory policy. There's no regulatory policy that says a change in ownership allows the creation of a railroad company. It matters in the narrow sense, which is that U.P.'s switching certain or reswitching tariff is phrased in terms of customers and not in terms of facilities. This is not a breach of contract case, though no one is saying that U.P. breached its tariff or breached a contract. What we are saying is that as a matter of regulatory policy and announced by the Surface Transportation Board itself, and as Mr. McBride says, pursuant to Congress' and the Board's policies, to go from any number of serving carriers down to a single-serving carrier, down to a rail monopoly, to the detriment of consumers, is not supposed to happen as a result of the merger. And this was a direct result of the merger. Yes, there was a subsequent step when U.P. canceled the restrictible switching of this facility, but U.P.'s own unilateral actions cannot bring the change in the chain of conversation. Thank you. We have four minutes on the button. Okay. I certainly understand. And now I'll pay attention to the selector in front of me. He will also respond and clarify it. Okay. I'm back on track. May I please have the floor? My name is Carolyn Jenkins. I'm with the Office of the Surface Transportation Board and the United States. With me is Michael Rosenthal of Covington & Burling, representing U.P., and he will take five minutes. The court here should affirm the board's decisions, which we need to remember. We're interpreting the board's 20-year-old merger decision in the UPSC merger. What petitioners asked for here was enforcement of that 20-year-old merger decision. And they asked for it on the basis of two things. If you look at their specific petition for enforcement, it's eight pages long. It relies on two conditions, two actual conditions in the merger decision. The first was the representations condition that we talk about here. But also they relied on the NSF agreement condition, which they now agree would not afford relief. The board here interpreted its own prior decision, interpreted its own prior conditions, and said, we're sorry, we cannot give you enforcement relief here. You are not the beneficiary, G3, or the facility under G3's ownership was not the beneficiary of any condition actually imposed in the UPSC merger decision. And now, before this court, petitioners are essentially raising a new argument that on the basis purely of the board's policy and statute, and even the NSF raises the precedent now, which precedent that we never raised before, and the board did not consider, the court or the board needed to remedy any harm that would have resulted before the merger. No matter how far attenuated, no matter how many years after the merger, no matter whether it was a pre-existing condition here, the facts are there was a UP reciprocal switching DRF in effect long before the merger that said specifically these terms, apply only to the customers specifically listed herein. Whether or not the merger ever happened, if there was still SP and the NSF and UP at the Modesto facility in 2001 when P&G purchased it, or when P&G sold it rather, that act of selling the facility to D3 would end reciprocal switching to that facility because the new owner would have to come to UP and negotiate whether or not to be included in that stripping DRF. The terms of the DRF are clear, and D3 had that information in front of it and made a poor business decision as they admitted before the board. They said hindsight is 20-20. They were given a copy of the reciprocal switching DRF. They were a sophisticated business entity. They could have reviewed the terms. They could have switched out with UP as they admitted before the board, and it was a miss. They missed it. Let me ask you this, and I have no shame. I will reveal that this is not an area of expertise for me. Are there options that she, me, and NSF might have to come before the board for asking for some new agreement rather than enforcement of this agreement? Well, they could have stopped reopening. It could have been a good, difficult standard because as we have long held the board, as long held one, as the parties consummate a merger based on the conditions the board actually enforces at the time, they're decrying to the fundamental right to walk away from that merger on the basis of a law-enforcement condition. So they could have stopped reopening, though. They could have argued their material change circumstances, material new evidence here. At your conclusion with respect to 322 points, when the board held in that 20 years ago, the board applied its policy, the board applied its price, and the board applied its law and said 3 to 2 points, which they admit, I mean, that's what a facility was at the time of the merger. It was a 3 to 2 point. Those 3 to 2 points will not suffer direct merger-related harm. And so they could have said, look, you made a mistake. You didn't take into account reciprocal switching access. And this form of reciprocal switching, for example, they could have argued was customer-specific. That's a restriction. That's some kind of a restriction. So when we go from 3 to 2, it's really like going from 2 to 1. P&G could have made that argument. MET could have come in. That was standing the representation. Even PP, at the time of the merger, P&G, that was standing the representation. I don't know what PP's and P&G have had to argue about, because they were specifically listed as a group. They were, but they could have said, for example, well, we think it's a restricted condition or a restricted connection to this second railroad, because if we ever want to sell our facility, we can't guarantee that a new seller can continue access. Look, we're restricted. The buyer. The buyer, exactly. I'm saying it's a long-shot argument, but I'm saying that it's an argument that could have been made by P&G. It's not an argument that could have been made by MET. That was standing the representation, since representations only protect those specific shippers. But they never made that argument. But they could have, and they could seek reopening. There is also a provision in the court's law, 49 U.S.C. 11102C, that allows if there is anti-competitive conduct for the board to order reciprocal switching in the case of an anti-competitive act. There's a response to opposing counsel's position that this is an anti-competitive act because MET has created a monopoly on this. Well, I would argue there's absolutely nothing in the record to indicate that U.P. has somehow used its power to close reciprocal switching. It wasn't even U.P.'s match that closed this switch. With respect to this facility, that's exactly what the problem is. The U.P. is the only real carrier operating, allowing itself to be, to take the stuff from G3's facility. So they do have a monopoly, whether they exploit it, I don't know, but they clearly are the only railroad. Okay, the only railroad to which they can get access on a rail line. BNSF is located five miles away, and as counsel said the other side admitted, YALO itself is located on MET. G3 could locate on MET all of these shippers who have access to two carriers. Yes, but obviously what YALO wants is they want direct rail access from this particular facility. If they don't have it, then U.P. will allow them only to go through the U.P. So U.P. has a monopoly. If they want to have rail access through BNSF, they've got to, there's some other mechanism, they've got to ship it over by truck from five miles away. It won't be on the network. Well, they could negotiate for some kind of a rate as well. The board in the actual merger decision found that at two to three to two points, like the Modesto area, the proximity of the other railroad and the fact that intermodal competition, including from trucks, was very prominent and a big source of competition in the area. The board concluded that that would not cause any of these facilities to suffer direct merger-related harm because that would sort of keep rates in check. The fact that you could truck material, that truck the product's rights over to BNSF or get interline rates on BNSF to some other location out there, that was keeping the rates down. But in any event, we are here not to question what the board did in the 1996 decision. They are essentially arguing what they are asking for would essentially amend that long final finding that three to two points would not suffer direct merger-related harm. Our policy is, although it's irrelevant because it's a condition for enforcement, but our policy is to provide the only harm from direct merger-related harm, that is from the action of the two railroads merging, would cause that harm immediately at that point. And if it's because there also was a pre-existing condition, that's something that they could have argued in the original merger proceeding or on reopening. But I have petitioned for enforcement of the actual holdings and conditions in the merger decision. The board has endeared considerable documents that they were interpreting. It was interpreting its own conditions and it refused, justifiably, to expand the plain language of its holdings and conditions here to give a new relief to a new party that was never before the board that was not involved in the original merger proceedings. And, in fact, isn't even a party to whom the representation on the MET letter wouldn't even apply. Now, as to these general representations... Councilman, before you leave that chapter, what's your response to opposing counsel's position that the representations were broader than to the existing customers and there was a commitment made to foster competition globally? Well, I would say, to the extent that assumes or reads into anything, you know, more than what is the plain face of the language here. I mean, we're talking about 1995-1996 statements. And the board, I think, reasonably refused to sort of read into any underlying assumptions about all three to two points anywhere that there are all facilities that had more than one carrier competition or that it would apply to a facility as opposed to what the plain language said, no shipper will become captain or no shipper will lose access as a result of the merger. No, the shippers did not become captain. I mean, G3 was not a shipper there, first of all. So G3 did not become captain. G3 has never enjoyed the competitive advantages that it claims it's been denied. They never even used reciprocal switching, so it's not entirely clear how they may have been harmed. But they also were, you know, the facility itself did not become captive as a result of the merger. As a result of the merger, it had access to two carriers. It was solely the, it was principally the pre-existing condition of that customer-specific switching tariff that was the reason that, you know, the P&G to another customer ended the switching arrangement there. And I see that answer my question. Can I ask you a question? In addition to the Title V APU standard, you've cited three cases, but what more effect is the loss of when you interpret, we quote, a court particular deference, why is there in the summary of the review is the agency's interpretation and clarification was in order. Costs said, well, these are laypeople, two or three are laypeople. I think of administrative laws, expertise, that's why you delegate to the agency. What's your response to what does that mean, the cost that these circuits place on the interpretation of your ruling order? Well, I mean, we're interpreting our own merger decision. This is a highly contentious merger involving hundreds of parties that came before the board. DOJ, you know, at the time even opposed the agency. Ultimately, after considering mountains of evidence, the board precluded three to two points would not suffer direct merger-related harm. It imposed a number of conditions, giving me a set of access unprecedented in history to its competitors' customers. You know, this is a situation where extreme deference was accorded to the holdings of the board's actual merger decision. And here, we're even a step remote. We're 20 years later, where the board is interpreting what it meant. The decision is not the deference that we would accord to the original decision. Right, yes. We're suggesting deference to the decision here, and we seek to enforce it when we have two laypeople who are among the three decision makers. Well, I mean, it's still the board. The board is still the agency. We presume not based on who happens to be sitting on the board at any given time, or whether or not they're a layperson or a lawyer. The board is advised by lawyers. In fact, I happen to be one of them. And the board, you know, gets even more deference here because it is interpreting and enforcing the meaning. That's to enforce the conditions of this prolonged final merger, which has many, many parties have relied upon and had a lot of settled expectations, frankly. And, you know, the board's refusal to extend those conditions beyond their plain terms is entitled to deference. And the board's decision to not interpret broad, pro-competitive, covering-type statements as binding, enforceable representations to forever maintain two-carrier coverage in perpetuity at every single facility, that's entitled to a lot of deference. And, you know, it was entirely reasonable under the circumstances. I mean, the UP is, maybe not even you bad blokes, but I hope you'll be able to stay on that path as you leave.  We have just five minutes remaining. Thank you. Thank you. Just to make things entirely clear, because there's a lot of language tossed around here, Union Pacific didn't cancel civil association. It didn't apply BASF to access to the facility. What happened is Procter & Gamble sold the facility. Had there been no merger in Procter & Gamble sold the facility, G3 wouldn't have been entitled to access from BMSF. G3 wouldn't have been entitled to access from SP because of what Union Pacific's tariff said. Union Pacific's tariff was specific to Procter & Gamble. And that's what the board found. The board found that P&G went from 3 to 2 because of the merger. But the subsequent reduction that occurred at this facility, mind you, not even for this customer, the subsequent reduction from 2 to 1 was not a result of the merger. The other important point is to note that what they are requesting is a new condition. They are not pointing to anything in the board's merger statement. They are not pointing to anything in the board's merger decision. They are not pointing to anything specific in UP's representations. They are asking to apply policy to something that happened 20 years ago. When Union Pacific merged, they carefully considered what the costs and consequences of this merger were going to be. We knew we had to resolve 2-1 situations. There were disputes about 3-2 situations. Some parties came to Union Pacific, and Union Pacific evaluated the circumstances, made certain representations, because it was willing to go that far. Other parties went to the board. The board vetted their claims in those conditions. And ultimately, when the time came for Union Pacific to make a decision, it looked at the conditions and had to decide, do we go forward with the merger or don't we? And based on our understanding of the conditions at the time 20 years ago, the borough went forward. And at the time, nobody raised this concern. Nobody said, what happens to these facilities at 3 and 2 points? And there's probably a good reason for that. It's because one set of concerns was about shippers. What happens to existing shippers? And if you look at their quotes and representations, Union Pacific does very carefully talk about, is a shipper going to lose competition? Proctor and Gamble didn't lose competition. No shipper lost competition because of the merger. There were other concerns that were raised about the siting of new facilities. Would there be enough options for shippers coming in to the rail network? Could they still site facilities at certain locations? And there were provisions in the board's order, and in Union Pacific's agreement with Burlington Northern and San Fe, PNSF, that talked about new shipper facilities. PNSF got the right to access new shipper facilities at 2 and 1 points, and on about 4,000 miles through the Santa Cruz Rides lines. So there's plenty of opportunity for companies like G3 to come in if they want to locate a facility and have servers from more than one borough that can do that. In Modesto, at a 3 to 2 point, there was likely no concern because you still get the competition. Indeed, Modesto, for a new facility's point, is really a 4 to 3 point where a shipper could locate on PNSF, could locate on MBT, or could locate on Union Pacific and can still play them off and get whatever sort of competition they want in deciding where should they put the facility. So there's competition for new shippers. The existing shippers remained. Yes. I'm just looking at this, and it's a late person. Procter & Gamble sold this facility for $11 million, and nobody thought to ask on behalf of G3, gee, I wonder if we can use it to ship on the road. Is that what happened? That's apparently what happened. They said they asked other people, but suddenly didn't ask Union Pacific. That was the record, and that's what they said. I don't know. Maybe it is the enrollment point. Somebody said, oh, but we missed it. I think there's a quote somewhere in the record. That's what G3's counsel said at the hearing. People are sitting here wondering what happened. Why didn't we ask? We missed it. Counsel, you said that a reduction from 2 to 1 was not a result of the merger. Was it a result of? Well, first of all, that's what the board said. He said it. I said it. First of all, there's no Chevrolet 2 on G3. It wasn't a 3-1 Chevrolet, 3-2 Chevrolet, 2-1 Chevrolet. G3 wasn't there at the time of the merger. My specific statement was a reduction from 2 to 1 was not a result of the merger. And my question is, if it was not a result of the merger, what was a result of? It was Procter and Gamble's decision to leave the facility. Procter and Gamble? Was it a 2-1? Yes. Thank you. Now, you've used all of your time, plus some of the extraordinary gifts from us. Why don't we give you two minutes as you proceed then to define yourselves. Thank you very much, Your Honor. I appreciate that. First of all, the agency counsel said that we didn't write the statute or policy or rely on it. Well, we did. ER-197 is a PowerPoint slide of the presentation to the board members, and it states in policy 1-2, you can't be deprived of competitive service and you can't take action post-merger to deprive you of relief. We cited decision number 44 standard articulating that. And ER-23-24 on reconsideration. In pieces, subsequent reduction from 2-1 was the result of the merger. It was. We can't ask pieces today had it not been before the merger. If they had done that before the merger, we'd have been in 2-1 and we'd have been entitled to relief under the policy. So their position is they can wait until after the merger and get away with something they couldn't get away with before the merger. The agency counsel said we were trying to upend the agency's policy. All contrary. We're trying to follow the agency's policy. The agency's greatest relief in limited circumstances in 3-2 is whether we're at 3-2 or in 2-1, we were entitled to consideration under that policy. She said we could have sought reopening of the merger. I've only been doing this, Your Honor, for 42 years before this agency. There has never been a reopening of a merger of two large rear rooms. That is a red herring. She also said they could have sought relief under 11-102, Terminal Traffic Traffic. They have never granted relief under that statute in the 35 years that the rules have been in effect under that statute. Never once. They're considering now changing, but they didn't ever do it before. And we did rely on their ability to issue supplemental orders, and that was in ER 82 when we cited Decision 21. And then, of course, G3 didn't complain in 1995-96. They suggested we should do that. The circumstances occurred in 2012. And finally, Judge Rawlinson, if I may address your question about deference, this is the arbitrary and capricious standard. The agency spoke out of both sides of the tribunal. On the one hand, it said we were 3-2, so we didn't get relief under the settlement agreement. And then, on the other hand, they said the DOP could have cut you off at any time, and therefore you never really had access to be here. Well, if that's true, then we had only access to two railroads, and we were reduced to one as a result of the merger. There was no expertise here because they didn't rely on the statute. That's all we get used to in this huge subculture. Now, I think that's discussionary because the G3 was not part of the group where the decision was made. Not quite, Your Honor. I understand why you might be confused, but the circumstances that deprived us of access to the NSS occurred to G3. Had that been done to Procter & Gamble, Procter & Gamble would have been a 2-1 and would have given you definition. That's right. But they did it to us in 2012, and that should have entitled G3 to relief. Right. Now, I'm not saying that the position of the board is that because you were not P&T, that same consideration does not apply to you. But it does because it applies to every shipper in America if you're reduced to 2-1 as a result of the merger under their own policy, which, of course, this Court's precedents require them to follow, they were entitled to relief. And so I'm going simply to use the standard as rationality was an agency decision of rationality, not abuse of discretion. And it can't be rational because they contradicted themselves on whether we were 3-2 or whether we ever had access to P&N in the first place. I'm ending. Your Honor, as you can, I thank you very much. Well, I thank all the other arguments in this case. The P&T enterprise versus the Surface Transportation Court has now submitted for decision, and that concludes our arguments in this hearing.
judges: W. Fletcher, Rawlinson, Pratt